May it please the Court, good morning, or afternoon, somewhere between the two. Jerry Kaplan on behalf of the appellants and cross-appellants, commonly known, I'm probably referring to it as the Yazian parties, for simplicity's sake. I might note this is a rather unusual case, it's gone on for ten years, but what I'd like to focus on is really the fraud on the court argument element of this case. I mean, this whole case is one of the black marks. I've been doing this 38 years of the judicial system because it started with fraud, it had fraud by a trustee, it was fraud from the entire beginning. I want to say this because I think this is important when we look at the judicial system as a whole and the effect it has on other people trying to commit frauds in this world. First of all, the case only came to bankruptcy because of a fraud between a half-owner of a building and a creditor who decided to cheat the other creditor out of half the building. That didn't come to light until seven years later when the court system tried that case in the Superior Court in Los Angeles and it was obvious to everyone, even punitive findings were found against the creditor, that these two people conspired to wipe out the other guy and take his money, which is my client, the ASEAN parties. But what gets more complicated is because we think then they file a bankruptcy and we'll have a trustee who is honorable and who is going to abide by the rules and would discover this initial fraud, which he did not because he had his own greed and fraud to achieve. So what he does, and you know what the problem with conspiracy is, and I've been doing federal criminal for 38 years, this is very hard to uncover conspiracies that cheat people out of dollars because most of us lawyers are not the FBI and most of our lawyers don't get to go inside avenues to find all this out. But in a related problem, the FBI is monitoring the mayor of Compton and the trustee, overhearing because there's bribery involved in Compton and kickbacks and what have you, and they happen to overhear the fact that the same guy, Price, is also cheating in the bankruptcy area and he's a trustee. So some years later they find this out and everything starts to come to light as it usually does. Right, but the specific issues we have before us are whether or not there was a fraud on the court that should nullify the sale order, whether or not the denial of the request for attorney's fees on the part of the other parties was correct, and the cost. So basically we have three. And the jurisdiction argument. That's part of the challenge to the sale order. All right, I agree with you. So I wanted to put it into some perspective. Yeah, you can rest assured we've read the briefs, which are very lengthy. I understand it. You can rest assured I didn't write it. But I came in late. But what I'm saying is when we look at fraud on the court, what are we looking at? We're looking at the Dixon case and the cases that say what do we need to prove fraud on the court? There's no question in this case there was fraud on the court. Well, there is a question. That's why we're here. The question is whether or not the court, not the trustee. I mean, we know that the trustee was dishonest. But whether or not there was an effect on the rulings of the court, to me, is the critical point. In order for there to be fraud on the court, the court has to be affected. So how is the court affected by the fraud? Because Price lied to the court and lied. He was the trustee. The court would say to him, what should we do here? He lies to the court about the bid rigging. He lies to whose ownership the property is. But he really lies about getting kickbacks. He lies that the property only belongs to the debtor when everybody would realize the property belonged to the partnership. But the real fraud on the court is at the time of the sale. He lies about what's going on in the sale. And when he permits a fraud on that court in two ways, that way as well as in the fraud of lying to the court whose property it is. Here's the problem that I have with your argument is the bankruptcy court concluded that the estate suffered no harm as a result of the sale. So how can we say that any fraud affected the court when the court itself said that the sale of the property was reasonable? The price at which the property sold was reasonable and the estate suffered no harm. So how was there fraud on the court in a legal sense when there was no effect on the sale? Well, you know, in Dixon there was fraud in Dixon and even the district court found there needs to be no economic impact on the court when there's fraud on the court. When there's cheating in the court, the court's dignity is sufficient. And even the district court in this case found that there need not be any economic harm. And I think that's the state of the law in the Ninth Circuit, that economic harm isn't one of the prerequisites for finding fraud on the court. The bankruptcy court concluded there was no evidence of a chilling of the bidding process or any collusion or conspiracy on the part of the parties who bought the property. I understand. That's where we want to argue. Do you have any evidence or can you cite to the record whether that's otherwise? Yes. All right. Please proceed. Here's the evidence is clear that the buyer, the Chorsky parties, had a deal with Price. Did the court find that? No. So you said the evidence is clear. How did the court miss it then? Well, then, because let me back up whether it's clear. They found in summary judgment that there are certain facts that each alone decided it wasn't enough to draw an inference to have a trial, because that's what we're wanting here is a trial, to have a trial to determine whether the buyers were complicit in the fraud. The evidence that and when you take a look at facts that raise inferences, if you look at each fact alone, i.e. a fingerprint without knowledge of the individual's goings-on in a certain area, you can explain every fact. But when you put one fact upon another and draw those inferences, it's compelling in this case that there's sufficient inferences to be drawn that the Chorsky parties, the buyers, were complicit. Let me give you, and I think we point those out. If we take a look, first of all, that Chorsky was a broker. He buys a building. Price decides to sell this building, which is part of the fraud. He decides he'll call one of his clients, who was a client of his, Chorsky. He makes a sight unseen bid for this building at $8.6 million. Even though he's a broker and could share in the commission by just going into the bankruptcy and bidding $2.50, he used Nelson Sheldon, the broker, whose daughter, and this is all agreed upon by all the parties, agreed to kick back the commission to Price. But where is there any evidence that the buyers knew or took part in any of that? Well, Price, the broker, Nelson Sheldon, was a dual broker. It was not only Price's broker, but it was Chorsky's broker, and the inference can only be drawn, since he's a broker himself and could have saved $2.50, that what Price really wanted was an extra $250,000. He needed one broker to carry out this transaction so he could get more dollars. That's a rational inference drawn from that. So what's the evidence that the buyers were part of that, though? I don't understand. All right, here's the evidence. Chorsky is a broker. He can put the offer under his own name. If he does so, he saves $250,000 in commission. Instead, he puts under Nelson Sheldon's name the corrupt broker who's in bed with Price, and in order so... So that's evidence that they were complicit because he chose not to put the offer in his own name? As I indicated to this Court, if you take a look at that one fact, you may have an explanation. Let's go to the next fact. The sale was built as is, whereas is. As we cite in our brief, and we cite from the record, $700,000 was paid by the estate by Price, and with only an inference, to fix that building while it's... after that offer is made by Chorsky. Why would anyone do that, spend estate money, when it says, whereas as is? The answer to that, certainly a reasonable inference can be drawn when you take a look at the kickback. They're using the same broker, and he wants a bigger kickback. He's getting something in return. There's no telling what Price was getting. I agree with you that Price was corrupt. But let me go, because I know I may have to... I know I need to go a little bit further. So just give me an opportunity to do so, because this has been going on a long time. But the $700,000, why would he give it back to Chorsky from the estate, if Chorsky isn't involved? Chorsky has the same attorney, has the same broker that he didn't need. He gets $250,000. I mean, these are inferences, because it's a summary judgment that can be drawn in the Yassian favor. Not only that, we know that Yassian, that Chorsky, who had no knowledge of this mayor, who was the kickback king of Compton, who was dealing with Price, he... and the timing's important. At a certain point in time, donates to the mayoral campaign just before the close of the tax rule. Who does? Chorsky. So now we have the following evidence. $700,000 is put back into Chorsky's building from Yassian's estate. No one should do that as an as-is building. A broker gives up a $250,000 commission to Chorsky so that he can, on the one hand, have the same broker, corrupt broker, as the estate. Because remember, in a brokerage transaction, there's two halves of a brokerage transaction. 3% to one broker, 2% to one broker, 2% to the other brokerage. This time it was 2.5%. So what occurs in this case is that if every other buyer walks in there with their own broker, Price can only rip $250,000. Isn't it a coincidence? But isn't this an inference I can draw in its prior effect, at least to hear, that Chorsky, a broker himself, walked in there for a $500,000 broker to the same brokerage that's kicking it back to Price? Isn't it an unbelievable inference that just before Chorsky, who probably never met the mayor of Compton, all of a sudden is donating to his property? I mean, let's take a look at real life. Isn't it a coincidence that, unbelievable, can I draw an inference, they have the same lawyer, they have the same broker, he is given, without anyone else, the right to buy this immediately, sight unseen, and we're suggesting there's no complicity in this whole arrangement, and we're suggesting that without discovery, without a trial, on a motion, and we're deciding that not only on a motion. Well, if there's a motion for summary judgment, I mean, before a matter goes to trial, there has to be some evidence presented. We presented that evidence. But you're presenting coincidences and... Well, you know, Judge, I don't want to call them coincidences. Well, that's what you call them. Well, let me back off and tell you this. If those are facts, what I was doing is being sarcastic. I have one fact, two facts, three facts, four facts. But are they all undisputed facts? That's sort of... Yes. All right. No one disputes any of those facts, the $700,000, the brokering, the fact that it was a double commission, that they used the same broker. Well, the money to Shedorsky is not an undisputed fact. You said the money must have gone back to Shedorsky. No, not to Shedorsky, to Price. To Price, I'm sorry. No, they admit that. Everyone agrees that. And he popped out at his time of his, when he pled guilty and had admitted all that. No one disputes that the money, the broker was paid. I admit he didn't get complicit with Shedorsky. Right. But the fact is... That's my point. But that's the point. But the point... Here is my experience. When somebody starts to plead guilty, when they're trying to get a deal for themselves, they give up everybody that's involved. So if the Shedorskys were part of this, just like he gave up his daughter, he gave up the mayor, he gave up everybody else that was involved, if the Shedorskys were part of it, why wouldn't he give them up too? Well, number one, he didn't give up the mayor. The mayor actually was eavesdropped. His daughter, he didn't give up. She was caught separately. But in the plea agreement, when he has to confess what he did in order for the court to accept the plea agreement, he has to agree to all this. If all of these things happened and he did all of these things, why wouldn't, if the Shedorskys were part of it, why wouldn't he agree to that as part of pleading guilty? And you asked us to infer that that was money that went back to the Shedorskys. No, no, I've asked you to infer this, that I don't think anything went back to the Shedorskys. All this was done, we know something went back to the Shedorskys. What? The $700,000 that was used after said, as is, to fix, what happens is they get an offer, as is, whereas, which means you buy a building, no matter what it looks like. Well, but people who sell houses or buildings all the time fix a buck for curb appeal. Whether or not you're selling the ad is, it's a matter of the seller preference, whether or not you want to, you know. This is after the offer is received. No, but you receive an offer for your house for a million dollars, and, I mean, $700,000 is not peanuts. And you're going to put another $700,000? Well, in terms of the value of the building, it's like $10 million or something. Seven percent. But you're going to put some more money into this building for the seven percent because you're a nice guy? The fact is, is that... Well, maybe Price thought he was going to get something out of it, and he didn't. We don't, I mean, it's just... The point is that you're asking us to speculate, particularly about the Shedorskys. Well, I'm not asking you to speculate, because what I'm asking you to do is draw... Look, if I... Go ahead. What you're asking us to do is draw a reasonable inference from the fact that you are asserting. Correct. And that's what I'm entitled to do on a summary judgment. And we're entitled to determine whether or not those inferences are reasonable. Correct. But no one can tell... I mean, you can't, and you can... And we might. And you may well do this, because I can't stop you, but you may well do this and tell me that someone giving up a $250,000 brokerage commission because they need a dual broker, that dual broker who's a general broker for both of them, and I can infer knowledge to both of them, and we know the broker... The minds of business people are sometimes very difficult to track. But there's certainly a reasonable inference you can draw that he knew about the kickback. You can certainly draw a reasonable inference of the $700,000 that someone did that. One of the inferences to draw reasonably is there a kickback that he knew about, and Shedorsky was complicit. Another... I agree there may be another inference to be drawn, but the question is, if you're drawing it in my favor, you must... and this is a summary judgment, shouldn't I be allowed to go to trial? Because in cross-examination, in evidence, the timing of these things, how they came about, wouldn't that convince the trier of fact whether or not these inferences were correct? Was there any discovery conducted in this case? No. Oh, yes. A few depositions as to... I take it back. A few depositions that were excluded from the record because of a problem of the previous counsel. All right. But even without those, because with those, of course, we have the chilling effect on the building. We have the fact that everyone... Even in those depositions, though, was there any concrete evidence of complicity on the part of the Shedorskys? In my opinion, without a doubt, because there's overheard conversations about taking bribes at $250,000. There is evidence of associates talking about a $2 million bribe to get the $700,000. I mean, that price was going to get more money out of the building, but when the price... Price, price, price. No, no. Because Shedorsky was going to give him more money, but he had to pay $2 million for the building. Because, you know, Shedorsky gets $700,000 for the building at 8-6. Fix it up as is, whereas. I mean, as is, whereas. And then, because he thinks he's getting it at 8-6, when it goes to 10-6, he goes back and there's allegedly overheard, and we have, which are statements against interest against Shedorsky, that I'm not paying you the money I promised to pay you. Because what really happens in this case, Your Honor, is when I draw every reasonable inference, from the dual, the fact that... Oh, the last fact, and that's Mr. Yasso. The last fact is the $100,000 reduction in price at the time of the bidding, where Nelson Sheldon and Shedorsky says, I want a $100,000 reduction in my bid. And she agrees to kick back 100 grand. And she's an officer of the court because she's representing the estate as a salesperson. He's complicit in that, in the kickback. Without a doubt, he's complicit in that. Okay, counsel, why don't we hear from the other side? We understand your argument. Good afternoon, Your Honor. David Stern, appearing on behalf of the Shedorsky parties, for the correct pronunciation. Mr. Mazel, who represents the trustee, and I have agreed to try to split the 20 minutes. I would like to have 14. Mr. Mazel has agreed to take six. And I'd like to reserve two of those minutes for rebuttal because I do have the cross appeal, although I'm not sure we'll ever get to it. I was just listening to the argument of my colleague, and I have been involved in this case for seven years, and I am familiar with the record. And what he has quoted from is not in the record. I would challenge him to point out precisely where it is in the record. And furthermore, much of the evidence that is in the record was properly stricken, both for violations of the federal rules of evidence and the local rules. Now — Is the $700,000 from the estate into the building, is that in the record? You know, I recall that there is evidence that there was money that was not into the building, that there was a contractor who was paid money in connection with the improvements. Whether or not that was ever put into the building is not in the record. My own recollection is it was not put into the record, and I don't know if $700,000 was the number. There was some money that was spent on some roof and some air conditioning repairs, and they were actually ineffectual repairs, if we're going to go outside the argument. Well, the argument is, if you're selling a building as is, where it is, that there would be no incentive to put any repair work into the building but for complicity to kick back money to the buyers. Well, no. Actually, let's sort of get back to where the record is. And by the way, there were probably 15 depositions taken in this case. There's plenty of discovery. It was pending for four years. But in terms of the money, there was, in the plea agreement, the fact that there was a fellow named Scorza who was doing the repairs for Price on his mother's house and on buildings that Price had, and that he got a bunch of money. There was absolutely nothing in the record. There is absolutely no allegation that I've ever seen that any of the money that Price paid in connection with allegedly maintaining or improving the building ever was done with a consent, the direction, the desire of my client whatsoever. So it was a vehicle for Price to foster his kickback scheme with the contractors. That was exactly what it says in the plea agreement. And, you know, one thing that you did mention in your statement, and I would reiterate, Price had every incentive to implicate whoever he had to implicate. And his deposition was taken in this case. Notably, it wasn't introduced by the other side because it didn't do him any good. But that is, you know, in terms of where we are and in looking at the record, what we have here is a record that is, as the district court correctly summarized, and I understand this is a fresh look, but as the district court correctly summarized, there were a series of minor issues that were attempted to be stitched together in a manner which a whole series of cases teach us as absolutely inappropriate. Matsushita is the main one from the U.S. Supreme Court. It's been applied dozens of different ways, and it's been applied as well in this court, and I've cited those cases to this court. But the notion that you can prove up fraud on the court, an extraordinarily serious claim, by simply having a couple of, for want of a better term, innocent facts. I mean, you have to take the fact that my client, who is a licensed broker, didn't act as one in this case. So what? You take as a fact that during the course of the bidding — that he would have saved himself $250,000 if he had acted as the broker himself, and that's no small amount of money, and so it's an implication, it's an inference, at least from opposing counsel's point of view, that there was some hanky-panky. You know, I — but I get to the basics, which is that all of this court's jurisprudence, all of the U.S. Supreme Court's jurisprudence, teaches us that when we look at things like conspiracies, when we ask ourselves whether they exist or don't exist, we look for facts, we look for indicators, and we look at what the reasonable inferences are from them, taking into account the circumstances. The circumstances which include, as Your Honor alluded to, the fact that the sale was for more than a subsequent appraiser determined was fair value. The price obviously went up. The fact that there is — that there was a break in the proceedings and there was a — the broker agreed to cut her commission by $100,000 is, for want of a better description, a so what. That is a normal transaction, and in fact, the Seventh Circuit about 50 years ago and the restatement today, and again, I've quoted from those things in my brief, and as you pointed out, it's a voluminous brief. The courts have said that's not an issue. And what I would emphasize to Your Honors is that if one looks at this particular case, you start out with the fraud on the court doctrine and you ask yourself, was there fraud that compromised the workings of the wheels of justice? And was my client complicit, knowledgeable, actively involved in that? And the reason I say that that's required, and there's been an argument to the contrary, is that it makes no sense to not have him involved and then have him punished and have his property taken. But it's also — there's a case that this Court decided, and I cited it again. It was called Latshaw. It was — I could give the site, but it is in the brief, which said that you have to have complicity. And if you're going to draw inferences, they're going to have to be inferences based on facts and on admissible evidence. We don't have that here. And I understand that my colleague has not been in the case as long as I have, but you try to paint with a broad brush. You try to say there's just all this stuff out there. We have gone through in our brief the evidence as it exists. And I do submit, Your Honors, that the evidence as it exists supports the judgment that was entered by the bankruptcy court and the lengthy decision by the district court that analyzed it with great comprehensiveness. Did you — were you going to address the cross-appeal at all? I would like to address the cross-appeal and reserve a couple of minutes as well. Your Honors, I'd like to really rest on one case for this, the Lafarge case. The Lafarge case is a case that is virtually identical to this one. There was an underlying contract. The contract had his attorney's fees provision in it. It was a construction contract. The — one of the parties got an arbitration award, and the other party subsequently moved under 60b-3 to set it aside for fraud. And I agree that fraud on the court and fraud under 60b-3 are somewhat different, but the primary difference between those two is that one has a one-year reachback and one really has an infinite reachback. Well, the problem that you have is that the circumstance of this case rose out of the sale order and not the purchase agreement. Right. But the sale order itself was a product of the purchase agreement, and the purchase agreement had an arising out of provision in it that's arising out of that contract. In California, which was the operable law that was working here, arising out of connotes a broad — a broad construction. It is not on the contract. It is rather arising out of the contract. Some courts have said it is a but-for test. But for the contract, would there be this dispute? And my position is that this was a broad-form clause and that a similar broad-form clause was construed in the Lafarge case to apply to 60b-3. What's that standard of review on this? Your standard of review on this one is de novo. The bankruptcy court's finding as to whether or not it arose out of the agreement, we review de novo? No. If it were a — the legal decision as to whether or not because this was a unique issue, you would review de novo. But how do we review the bankruptcy court's finding as to whether or not the sale arose out — the issue arose out of the purchase agreement? Is that clear error? You know, I don't think so, Your Honor. I think it would be abuse of discretion. Excuse me. I think it would be clear. It would be de novo review because — I'm not sure if clear error and de novo is the same. Perhaps I'm mixing it up. Well, I would think that's a finding of fact, whether or not the circumstance of this case arose out of the agreement. I — You know, I hear the argument. I actually think that — Well, I'm not arguing. I'm asking you. No, I — my view would be, Your Honor, that it was decided that this was not the type of case that an attorney's fees clause could cover as a matter of California law. I believe it would probably be either a question of law or a mixed question of law, in fact. But that would certainly be our position. I'm more than happy to take additional questions. But if I — if you don't have any, I would give my colleague the additional time and reserve just a minute for the rebuttal on the Lafarge issue. All right. Thank you. May it please the Court. Sam Maisel for the successor trustee, not the old trustee. Robert Goodrich. Your Honor, the — I'm only going to address two issues before the Court. And while I'm sitting on the side of the Chiodorchis, I'm actually opposing the Chiodorchis' appeal with regard to the attorney's fees, and I'm opposing the appeal of Mr. Yassian with regard to the denial of his request for administrative expenses. So let me take first the denial, the bankruptcy court's denial of Mr. Yassian's request for payment of administrative expenses. That's just the flip side of the adversary proceeding challenging the sale order. In some respects, it is exactly that, Your Honor. What they've tried to do in this admin expense is take the judicially approved sale of the building and collaterally attack it by arguing it was done without jurisdiction, an issue they never raised on direct appeal, although they should have, and now fashion it as a tort, and then argue that the estate now has an administrative expense obligation under the Supreme Court decision in Redding, which says that a trustee who commits a tort creates an obligation of the estate for administrative expense. Now, the problem with Mr. Yassian's argument on the administrative expense is that they, first of all, they clearly could have raised these jurisdictional issues, and in fact did raise the jurisdictional issues at the auction of the building. And at that time, the bankruptcy court overruled their objections and found that it had the right to allow the trustee to sell the building. The building was then sold, and Mr. Yassian did not take a direct appeal. Subsequently, he then entered into a settlement, which is called somewhat inartfully the settlement deal term sheet. This settlement agreement included Mr. Yassian's waiver of all causes of action  subsequent to the sale, and after the court had decided the jurisdictional issues. That is the decision the bankruptcy court reached. Resting on that waiver, the bankruptcy judge found that Mr. Yassian had waived these claims that are expressed in the administrative expense request. Now, this then was appealed to the bankruptcy appellate panel for the Ninth Circuit, which affirmed on the same grounds. And I urge the Court's affirmance today on those grounds. This settlement could not be more clear about the express waiver of these kinds of claims by Mr. Yassian. Now, at the bankruptcy court, we also argued, and the bankruptcy court agreed, that the estate has derived judicial immunity because these acts were subject to the court's review. They were properly noticed by the bankruptcy trustee. And there's a leading Ninth Circuit case, Bennett, which we cite in our pleading in our brief, where the Ninth Circuit says there's three standards. The first is, was it properly noticed? Was the trustee candid? And then did the bankruptcy, did the court approve the action? All of those are present here. The only issue is with the candor. The second factor was the trustee candid. And remember, the issue they're raising with regard to the administrative expense is not these kickbacks in proceedings or things of that nature. What they're arguing is that the bankruptcy court usurped its authority, that acted outside of its jurisdiction, by allowing the building to be sold. Now, that, there isn't any question that that was fully described and discussed and ruled on at the bankruptcy court. There's no issue about the trustee's candor with regard to those issues. They were fully raised by Mr. Yassian, ruled on by the court, and never appealed, as they should have been. So for both those reasons, now, the district, the Bankruptcy Appellate Panel didn't get to this issue, but we urge that if the court does not find the settlement dispositive, then we think that derived judicial immunity is a second alternative ground for affirming the bankruptcy court. Could you address the, excuse me, the attorney's fee request? Yes, Your Honor. The issue here for Mr. Chodorsky is whether or not the attorney's fees arise out of the purchase agreement. And the problem for them, as the district court, I thought, very carefully perused the cases cited by both parties and fairly addressed it in a very lengthy opinion. And while I recognize this Court reviews the bankruptcy judge, certainly a well-thought-out opinion of the district court should not be completely overlooked. The problem is that the issue here is whether fraud on the court, which is the basis of my client's original adversary proceeding, which we then subsequently sold to Mr. Yassian, but that adversary proceeding was based on fraud on the court. That was independent of the purchase agreement. Is that right? Correct, Your Honor. It was based on the issues that have been described already by both parties. If the parcel was independent of the purchase agreement, there can't be attorney fees. Your Honor, I think that's exactly right. I mean, the purpose of fraud on the court is to vindicate the respect due to the court, that you shouldn't mislead or commit fraud in obtaining a ruling of the court. For reasons beyond the scope of this hearing, my client subsequently sold that adversary proceeding, but we brought that adversary proceeding on behalf of Mr. Goodrich, and that is the gravamen of the complaint. This was an issue about fraud on the court. It had really only tangentially to do with the sale of the building. If there are no further questions, thank you. I think they used your time. We'll give you two minutes. Oh, I thought I was about to go back and sit down. Thank you. Well, you can if you like. I don't. Thank you for the two minutes. I would cite that the $700,000 is in the record at page 1582, and it's in our opening brief on page 20 where we indicate that those facts, and I'm going to agree with the trustee as far as the attorney's fees and not argue that, but I am going to once again argue the inferences that I can draw on fraud on the court and suggest two other things. Every bit of evidence is cited in my brief as to the $100,000 kickback, as to the dual representations, as to both of the broker and as to Price being a lawyer representing both of them. As to the $700,000, I just cited it as a page as to the $100,000 kickback. $700,000 is on 1582? It was on page 20 in my opening brief, but it's in the record at page 1582. I was looking for that, and I don't see it. I just see it says it's sold as is, where it is, but I don't see any reference to $700,000. Well, if you take a look at page 20, in the brief it does indicate $700,000. I'll have to get the page number. Again, I apologize to the court, but I didn't write the brief. But I did read that in the record, and I can supplement. Secondly, the other items I indicated are all true. He was a broker. He gave up $250,000. He contributed to a mayor campaign, and I want to answer the judge's question, why wasn't it in the plea agreement, or when he came clean? He didn't go to jail on this case. This was a tangential case. He went to jail on the bribery of the mayor of Compton. He never got any time for this case. He didn't plead to this case. He went to jail for the bribery. He just copped out to this case to the FBI. When you're doing a plea agreement, you're doing the case you're working on, not in all the other crimes you've ever done. And all this came to light because they found the money trail between the brokers and Price. They found the money trails between the broker and Trzodorski and the mayor. They found the money trails between Sheldon and Price, the broker, whose daughter worked for the broker. They found all that in that, and that's how they saw the kickback theme. They heard it over the telephone on a wiretap. You can't tell me that if we heard this case, and this was a bribery of a judge, a trustee is just as important as a judge in bankruptcy court because he determines what's going to happen in a bankruptcy court. And some buyer who has an intimate relationship with the trustee, who's represented by his law firm, who decides to use the same broker, who happens to get all these. Is fraud on the trustee tantamount to fraud on the court? It is. And there are cases that say that? Fraud on the court is fraud on a judge, yes. And the case I cite, I mean, fraud by the trustee on the court. When an officer of the court commits fraud, what are you saying to the rest of the world? The trustee is an officer of the court. But you as an attorney are an officer of the court. If you commit fraud with your client, that doesn't mean that there has been a fraud committed on the court. I know, but the difference between me and the trustee is the court appoints the trustee as its arm, like a probation officer comes to you when you're a criminal judge and commits fraud. But doesn't it have to go one additional step? Doesn't the fraud have to impact upon the court's decision? It's not enough that there's just fraud, but the fraud in this case would have to have influenced the court's decision in some way, wouldn't it? Under Dixon it says no, because we're not going to tolerate an arm of the court. I used officer wrong. An arm of the court, the trustee, I apologize. The arm of the court, to send a message out there that we can always use an arm of the court. We can have another dishonest trustee, but as long as we can keep it under wraps, nothing's going to happen. And even those in bed with him, we're going to be, nothing's going to happen. But, yes, Dixon says it doesn't matter about the economic impact, because that's really what you're asking, Your Honor. No, no, that's not what we're asking. We're asking whether or not it affected the decision of the court. It absolutely affected whether the property is going to be sold. The whole position of this trustee saying there's no other owner of this property, there's, that this is, you know, I'm getting, I'm making, why do you think he didn't say when these other two guys, well, you have to look at the whole story. When these other two guys say Perry and the creditor get together to rip Yazian, they throw it in the bin. We've heard that. We understand your argument. No, you've exceeded your time. All right. Thank you, Your Honor. Thank you. Rebuttal. Your Honor, as I perceive it, I can only rebut on my cross appeal, and that's all I'm going to do. That's exactly right. The one question you asked was standard of review, page 54 of my brief. Whether the trial court's denial of an application for attorney's fees was proper under State law and the contract provisions is reviewed to no vote. Resolution Trust Corporation versus Midwest Federal. That's not the question I asked you. The question I asked you was whether or not the, what is the standard of review for the determination of whether or not the action arose out of the property agreement. I think that's probably a mixed question, in fact, in law. Thank you. I really have no other answer beyond that. I'm relying on Lafarge. I see. I appreciate the... Okay. The case just argued is submitted for a decision by the court.
judges: Marbley, Goodwin, Rawlinson